1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10    WILLIAM J. BLUE III,

11              Plaintiff,                    No. CIV S-05-1256 GEB EFB P

12         vs.

13    N. GRANNIS, et al.,

14              Defendants.             FINDINGS AND RECOMMENDATIONS

15    _____/

16         Plaintiff is a state prisoner proceeding without counsel in an action brought under 42

17    U.S.C. § 1983.  Defendant Scavetta[1] has moved for summary judgment.  After consideration of

18    the moving and opposing papers, and for the reasons explained below, the court finds that the

19    motion must be granted.

20    **I. Introduction**

21         Plaintiff's complaint claims that defendant Scavetta violated his rights by refusing to

22    grant him single-cell status.  Compl., at 4.  He asserts that he has obstruction sleep apnea, and

23    that this medical condition requires that he have single cell status.  *Id.*, at 4-5.  He claims that

24    defendant Scavetta denied plaintiff's request for a single cell and, in doing so, violated his rights

25    _____

26         [1]  The court dismissed all claims against the other defendants named in this action before
      service of process.  Dckt. # 22.  Therefore, this action proceeds against only Defendant Scavetta.

1    under the Americans With Disabilities Act ("ADA"), Title II, 42 U.S.C. §§ 12131 - 12164, and

2    the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment.  *Id.*, at 4-6.

3    Plaintiff seeks damages and an injunction directing the warden to provide him with "cell access

4    as needed for C-PAP use."  *Id.*, at 7.

5    **II. Facts**

6          At the times relevant to this action plaintiff was a prisoner at California State Prison at

7    Solano ("CSP-Solano").  Compl., at 1-2.  Defendant Scavetta was the chairperson of the Unit

8    Classification Committee ("UCC") that decided not to grant plaintiff single-cell status.  Def.'s

9    Mot. for Summ. J., Stmt. of Undisp. Fact in Supp. Thereof ("SUF"), SUF 13.

10         When making housing decisions, corrections staff generally allow prisoners to seek

11   compatible cell partners.  SUF 22.  Thus, prisoners can attempt to work out problems, such as

12   snoring, before being housed together, as by a heavy snorer finding a prisoner who is not

13   bothered by snoring.  *Id.*  As a practical mater, there simply is not sufficient space to afford

14   every prisoner who snores his own cell.  SUF 23.  On April 25, 2003, the Deputy Director of the

15   "CDCR" issued a memorandum explaining that in order to maximize the space available within

16   the prison system, all prisoners would be double-celled unless there were specific reasons for a

17   prisoner to be housed alone.  SUF 11.  Those reasons related to prisoner safety and institutional

18   security, e.g., a prisoner with a history of in-cell sexual abuse, attacking cellmates, or predatory

19   behavior towards a cell or dormitory partner.  *Id.*

20         Plaintiff has a history of snoring.  SUF 4, 5.  Throughout 2003, he had difficulty

21   breathing at night and because of his snoring, his cellmate would wake him up repeatedly.

22   Def.'s Mot. for Summ. J., Attach. 3, Ex. 3 Thereto ("Pl.'s Dep."), Pl.'s Dep. at 19-21.  At

23   deposition, plaintiff testified that he once punched a cellmate when the cellmate repeatedly woke

24   him up because of his snoring.  Pl.'s Dep., at 20-21.  Other times when a cellmate woke him up,

25   he and the cellmate had "words and real loud arguments that [sic] when the CO knew it was time

26   to move the person out of the cell."  *Id.*, at 21.

In May of 2004, a medical technical assistant suggested that plaintiff request what is known as a C-PAP machine to help him breathe at night. *Id*., at 21-22. Around May 10, 2004, plaintiff applied for a C-PAP machine and to be housed alone by submitting a request for reasonable accommodation of a disability. *Id*. at 18, 22. Around August 3, 2004, plaintiff was diagnosed with sleep apnea. SUF 6; Pl.'s Dep., at 29. Thereafter, prison officials provided him with a C-PAP machine, which keeps his airway open when he sleeps. SUF 8; Pl.'s Dep., at 23. However, this does not prevent him from snoring. SUF 8. Prison officials denied the request to be housed alone because they had no diagnosis for plaintiff at that time. Pl.'s Dep., at 24.

On October 13, 2004, Dr. Lamb, the Chief Psychiatrist, signed a document stating, "[Inmate] has been given single cell status - until such time as the issue is permanently resolved w/medical (temporary status only)." SUF 9, Def.'s Mot. for Summ. J., Ex. D. The document contains no explanation of what "issue" had to be resolved. SUF 9. The document stated that this was the result of a mental health evaluation, at the conclusion of which plaintiff was prescribed psychotropic medication. Def.'s Mot. for Summ. J., Ex. D. According to instructions on the bottom of this document, the original was to be placed in plaintiff's central file within 48 hours, and copies were to be placed in plaintiff's health record and given to the CCI. *Id.*

Shortly after receiving this document from Dr. Lamb, plaintiff spoke with the "building officer,"[2] who advised plaintiff to seek authorization for single-cell status from the Unit Classification Committee ("UCC"). SUF 10. Plaintiff appeared before the UCC on November 4, 2004. SUF 12. No medical staff was present. SUF 14. At that time, however, it was not CDCR policy to require the presence of medical staff for a prisoner's appearance before the UCC unless the prisoner had a mental health condition that made it difficult for him to understand or meaningfully to participate in the classification process. SUF 15. Defendant Scavetta chaired the committee. SUF 13. At deposition, plaintiff testified that during his UCC

---

[2] Neither party explains the particular significance or authority of a "building officer."

3

1   appearance, he told Scavetta of his one physical fight resulting from his snoring.  Pl.'s Dep., at

2   53-54.  Scavetta admits that she knew that plaintiff had sleep apnea and used a C-PAP at night.

3   SUF 16.  Scavetta also knew that plaintiff was having difficulties with cellmates because of his

4   snoring.  SUF 19.  Scavetta believed that conflicts based on snoring were not unusual, and that

5   the use of a C-PAP was not a sufficient medical justification to have single-cell status.  SUF 18,

6   19; Def.'s Mot. for Summ. J., Ex. E.  She also knew that Dr. Lamb had authorized plaintiff to be

7   housed alone and that this was plaintiff's preference.  SUF 17.  However, she determined that

8   plaintiff did not pose a threat to other prisoners as outlined in the April 25, 2003, memorandum

9   and she had no reason to believe that plaintiff's use of the C-PAP, without more, justified

10  housing him alone.  SUF 18. Defendant Scavetta asserts that she did not have information from

11  any medical staff that as of November 4, 2004, plaintiff had a medical need that required him to

12  be housed alone.  SUF 25.  Thus, Scavetta made the decision to deny plaintiff his request to be

13  housed alone.  SUF 26.

14          For his part, plaintiff asserts that at the time Dr. Lamb authorized plaintiff to be housed

15  alone, he was having considerable difficulty with cellmates.  Pl.'s Dep., at 17.  At deposition,

16  plaintiff testified that his confrontations with cellmates had caused his weight, cholesterol levels

17  and blood pressure to increase.  *Id.*, at 17.  He testified that he "was a mental wreck."  *Id.*  He

18  said that in the year before being diagnosed with sleep apnea, he had a cellmate only about 50%

19  of the time.  *Id.*, at 19-20.  This was because whenever someone else was placed in his cell, he

20  would tell the person "to find another place to live," and the person would do so.  *Id.*, at 19.

21  When he did share a cell, he had confrontations about his snoring because his cell partner would

22  wake him up 20 or 30 times a night.  *Id.*, at 20.  Other sources of conflict were that the noise of

23  the C-PAP machine annoyed some cellmates and that plaintiff had difficulties with cellmates

24  who smoked or burned incense at night.  Pl.'s Dep., at 74.  Plaintiff also testified that he tried to

25  find a compatible cellmate, but everyone he asked declined because of his snoring.  *Id*., at 58-59.

26  ////

Thus, whenever he was assigned a cellmate, it was because prison officials needed to house someone in his unit, and a bed in plaintiff's cell was available.  *Id.*, at 59.

On June 23, 2006, prison officials granted plaintiff single-cell status.  Pl.'s Opp'n, at 5.

**III. Summary Judgment Standards**

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Summary judgment avoids unnecessary trials in cases with no genuinely disputed material facts.  *See Northwest Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  At issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Thus, Rule 56 serves to screen the latter cases from those which actually require resolution of genuine disputes over material facts; e.g., issues that can only be determined through presentation of testimony at trial such as the credibility of conflicting testimony over facts that make a difference in the outcome. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Focus on where the burden of proof lies as to the issue in question is crucial to summary judgment procedures.  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  *Id.*  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion,

1    against a party who fails to make a showing sufficient to establish the existence of an element

2    essential to that party's case, and on which that party will bear the burden of proof at trial.  *See*

3    *id.* at 322.  In such a circumstance, summary judgment should be granted, "so long as whatever

4    is before the district court demonstrates that the standard for entry of summary judgment, as set

5    forth in Rule 56(c), is satisfied."  *Id.* at 323.

6        If the moving party meets its initial responsibility, the opposing party must establish that

7    a genuine issue as to any material fact actually does exist.  *See Matsushita Elec. Indus. Co. v.*

8    *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To overcome summary judgment, the opposing

9    party must demonstrate a factual dispute that is both material, i.e. it affects the outcome of the

10   claim under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

11   *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and

12   genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

13   party.  *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).  In this

14   regard, "a complete failure of proof concerning an essential element of the nonmoving party's

15   case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.  In attempting to

16   establish the existence of a factual dispute that is genuine, the opposing party may not rely upon

17   the allegations or denials of its pleadings but is required to tender evidence of specific facts in

18   the form of affidavits, and/or admissible discovery material, in support of its contention that the

19   dispute exists.  *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11.  It is sufficient that

20   "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

21   versions of the truth at trial."  *T.W. Elec. Serv.*, 809 F.2d at 631.

22       Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the

23   proof in order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587

24   (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).  However, the

25   opposing party must demonstrate with adequate evidence a genuine issue for trial.

26   *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989).  The opposing party must do

1   so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence

2   presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.  If the evidence presented

3   could not support a judgment in the opposing party's favor, there is no genuine issue.  *Id.*;

4   *Celotex Corp. v. Catrett*, 477 U.S. at 323.

5          In resolving a summary judgment motion, the court examines the pleadings, depositions,

6   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

7   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  *See Anderson*, 477 U.S. at

8   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

9   drawn in favor of the opposing party.  *See Matsushita*, 475 U.S. at 587.  Nevertheless, inferences

10  are not drawn out of the air, and it is the opposing party's obligation to produce a factual

11  predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F.

12  Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

13  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

14  some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could

15  not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

16  trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

17         On January 18, 2007, the court advised plaintiff of the requirements for opposing a

18  motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v. Rowland*, 154

19  F.3d 952, 957 (9th Cir. 1998) (en banc),  *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v.

20  Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

21  **IV. Analysis**

22         As noted, plaintiff claims that Scavetta violated his rights under Title II of the ADA and

23  under the Eighth and Fourteenth Amendments.

24         **A.  Americans With Disabilities Act**

25         The purpose of the ADA is to ensure that disabled individuals have access to programs

26  and services available to able-bodied persons.  *See Arc of Washington State Inc. v. Braddock*,

7

427 F.3d 615, 618 (9th Cir. 2005) (Title II contains an "integration requirement," i.e., ending the isolation and segregation of disabled persons from programs and services available to able-bodied persons).  Defendant Scavetta argues that plaintiff's condition does not qualify as a "disability" for purposes of the ADA.  Scavetta also argues that, even assuming a disability, plaintiff cannot produce evidence adequate to establish a triable issue of fact as to discrimination based on disability.  While the first point might be debatable, plaintiff has not presented evidence adequate to establish a genuine issue of fact as to whether he was discriminated against based on his medical condition.[3]

　　　　To survive summary judgment, there must be a genuine dispute about each essential element of plaintiff's claim.  The essential elements that plaintiff must prove at trial are the following: (1) he is disabled; (2) he is eligible, with or without accommodation, to receive or participate in a public entity's services, programs or activities; (3) the entity excluded him from participation in or denied him the benefits of its services, programs or activities, or otherwise discriminated against him; and (4) the exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.  *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).  Here, plaintiff appears to claim that the "program" or "service" to which he sought access was one which makes available to non-impaired inmates a single cell.[4]  However, no evidence has been presented that single-cells are offered to able-bodied inmates but denied to persons with sleep apnea or who snore or use C-PAP machine.  To the contrary, defendant Scavetta has submitted evidence showing that the general rule was that prisoners shared cells.  California was

---

[3] In light of this finding, the court does not address whether plaintiff's condition actually qualifies as a "disability" for purposes of the ADA.

[4] To the extent there is such a prison program, the Ninth Circuit Court of Appeals has held that the terms "services" and "programs" covered by the ADA include "all of the operations of a qualifying local government."  *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 731 (9th Cir. 1999)(zoning is an activity covered by Title II of the ADA). This principle applies to parole and prison disciplinary hearings, *Armstrong v. Wilson*, 124 F.3d 1019, 1024 (9th Cir. 1997), and substantive parole decisions, *Thompson*, 295 F.3d at 890.

having difficulty accommodating all the prisoners in the prison system and shared cells was a

necessity.  Defendant's evidence shows that only prisoners who had a demonstrated record of

causing serious physical harm to other prisoners were placed in single cells.  At deposition,

plaintiff testified that he once hit a cellmate for waking him up repeatedly during the night.  On

other occasions[5] when plaintiff's snoring awoke his cellmate and plaintiff became aggressive,

guards were able to calm plaintiff before he became violent.  That a psychiatrist issued a

document stating that plaintiff must be housed by himself without stating any specific reason is

not sufficient to demonstrate a genuine dispute about discrimination.  While it proves that a

psychiatrist believed that there was reason to house plaintiff alone, it is not evidence that

plaintiff posed a risk of harm to other prisoners such that he was eligible for the "program[6]" of

having a single cell.  On the evidence currently before the court, there is no genuine dispute

about whether Scavetta discriminated against plaintiff in refusing to give him single-cell status.

Defendant Scavetta is entitled to judgment as a matter of law on this claim.

**B.  Fourteenth Amendment Due Process**

Plaintiff's due process claim is apparently predicated on the belief that he has a federally

protected interest in being granted a single occupancy cell and that the denial of his request for a

single cell deprived him of due process of law.  Of course inmates "may not be deprived of life,

liberty, or property without due process of law."  *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974).

However, "there must be mutual accommodation between institutional needs and objectives and

---

[5] There are no specific incidents recounted in the record.

[6] It is dubious at best that there exists a "program" for which inmates become "eligible" to be housed alone.  The point of the ADA is to not exclude persons with disabilities from the same activities, etc., that non-disabled persons are allowed.  Here, no one is allowed to have a cell to themselves.  The state allows a prisoner to have a cell to himself only when that prisoner must be separated from others because he is dangerous, or to accommodate a serious medical or safety issue.  In that sense, if there is disparate treatment. it is in favor of impaired or disabled persons and not against them.  In any event, plaintiff has not shown any disparate treatment in how his request was decided vis-a-vis other non-impaired persons.  That is to say, he has not shown that persons with disabilities are excluded from the same considerations used to determine that non-disabled persons should be housed in a separate or single cell.

the provisions of the Constitution that are of general application." *Wolff*, 418 U.S. at 556.  Thus, in the context of prisoners' claims the United States Supreme Court has emphasized that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Sandin v. Conner*, 515 U.S. 472, 482 (1995).  In fact, "[s]uch flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life," *Id.*  The process due depends upon the interest at stake.  *See Wolff*, 418 U.S. at 557-58.  Thus, the first step in assessing a due process claim is to identify the interest at stake.  *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972).

The starting point in any due process analysis is whether the plaintiff has a constitutionally cognizable liberty or property interest protected by the Fourteenth Amendment. The Ninth Circuit has not addressed whether a prisoner has a liberty interest in being housed alone.  However, in an action brought pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), the Ninth Circuit noted,

> When prison officials have legitimate administrative authority, such as the discretion to move inmates from prison to prison or from cell to cell, the Due Process Clause imposes few restrictions on the use of that authority, regardless of any additional motives which are claimed to exist. It doesn't matter what label is placed on the action or what other reasons may be behind it; nor is it relevant that the conditions of confinement may become less pleasant as a result. We must allow prison officials the freedom to exercise their administrative authority without judicial oversight. Some administrative actions will inevitably make prisoners feel cheated; nevertheless, this does not give them a federal cause of action.

*Grayson v. Rison*, 945 F.2d 1064, 1067 (9th Cir. 1991) (footnote omitted).  In *Grayson*, the prisoner was dissatisfied with having been transferred between units in a single prison.  The Ninth Circuit held that the decision to transfer a prisoner between different units of a single prison is within the administrative authority of the prison and outside the reach of the federal constitution.  *Id.* at 1067.  It is no stretch to conclude that the decision of whether to house a prisoner alone is another such decision.  Under these standards, there is no basis for finding on this record that plaintiff had any protected interest whatsoever in having a cell to himself.

1   Therefore, no further process than what Scavetta afforded him was due.[7]  There is no genuine

2   dispute about whether Scavetta denied plaintiff any federally protected interest.  Therefore,

3   Scavetta is entitled to judgment as a matter of law.  Her motion must be granted with respect to

4   this claim.

5          **C. Eighth Amendment**

6          Plaintiff's last claim presents the improbable proposition that the decision to deny him a

7   cell to himself constitutes cruel and usual punishment in violation of the Eighth Amendment.

8   Scavetta argues that plaintiff cannot establish that she acted with deliberate indifference to a

9   serious medical need.  Plaintiff's opposition does not address the argument.  His complaint,

10  however, appears to suggest that because of his snoring and sleep apnea the decision denying

11  him a single-cell constitutes deliberate indifference to a serious medical need and therefore cruel

12  and ususal punishment.[8]

13         The Eighth Amendment's prohibition on "cruel and unusual punishments" does not

14  simply prohibit penalties that are grossly disproportionate to the offense.  It prohibits "those that

15  transgress today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and

16  decency.'"  *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978) (citing *Estelle v. Gamble*, 429 U.S. 97,

17  102 (1976), quoting *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968)).  A prison official is

18  deliberately indifferent when he knows of and chooses to disregard a risk of injury or harm that

19

20         [7]  Even assuming some level of due process protection of the interest asserted here, there
    has been no evidence presented that Scavetta applied the prison policy criteria in any manner
21  that would offend the Fourteenth Amendment's protections of due process and equal protection.
    The Court is well aware that the formality of process due is flexible and depends on the gravity
22  of the interests at stake.  As discussed, the plaintiff's interest in an accommodation for his
    snoring is in stark contrast to the state's interest in addressing lack of bed space in a crowded
23  prison.

24         [8]  A medical condition that significantly affects an individual's daily activities, an injury
    or condition a reasonable doctor or patient would find worthy of comment or treatment, and
25  chronic and substantial pain constitute serious medical needs. *See, e.g.*, *McGuckin v. Smith*, 974
    F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*,
26  104 F.2d 1133, 1136 (9th Cir.1997) (*en banc*).

"is not one that today's society chooses to tolerate." *See Helling v.McKinney*, 509 U.S. 25, 35 (1993); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  On the other hand, harsh and uncomfortable conditions are expected.  Convicted prisoners are entitled only to the minimal civilized measure of life's necessities and even inhumane conditions, that is risks so grave even to convicted felons that they are repugnant to those who have consigned the plaintiff to prison, do not amount to punishment if the state actor is powerless to change them or does not know of them.  Thus, what violates the Eighth Amendment is the infliction of suffering that is "totally without penological justification."  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

In this respect, it is useful to analogize to the *de minimis* use of force cases involving negligible injury.  Plaintiff's claim here posits the question of whether denying him his own cell in spite of his concerns over his snoring and sleep apnea is an infliction of such suffering.  Not every "malevolent touch by a prison guard" violates the Eighth Amendment.  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (only uses of force that are sadistic and malicious for the very purpose of causing harm violate the Eighth Amendment).  Therefore, "*de minimis* uses of physical force" are not unconstitutional unless they are of a sort that is "repugnant to the conscience of mankind."  *Hudson,* 503 U.S. at 9-10.  The conditions in question here, while governed by the deliberate indifference standard, are in that sense analogous.  Clearly, there are medical conditions that may warrant a single cell.  Indeed, the prison policy contemplates as much.  But plaintiff has not presented any evidence that Scavetta acted sadistically or maliciously or that she deliberately ignored a known serious medical condition that she ought to have known would cause needless suffering.  Rather, all that has been presented is a cryptic note that single-cell status was temporarily approved by Lamb without explanation.

The decision approximately two weeks later not to provide him with his own cell was consistent with the prison policy that inmates double-cell.  SUF 11.  Under that policy only inmates with a history of in-cell sexual abuse, attacking cellmates, or predatory behavior towards a cellmate or dormitory partner were placed in single cells.  The policy was grounded in the

1   legitimate interest in dealing with a heavy prison population.  The policy noted that it was

2   imperative to maximize proper bed utilization.  *Id.*  With that background, Scavetta as

3   chairperson of the Classification Committee, had to determine whether to exempt plaintiff from

4   the policy, and for how long.  Because medical considerations might warrant a single cell, the

5   question of whether Scavetta was deliberately indifferent to any basic need turns on what

6   information Scavetta had as to any such need.  *Farmer*, 511 U.S. at 837 (To constitute deliberate

7   indifference the official must "be aware of the facts from which the inference could be drawn

8   that a substantial risk of serious harm exists, and [s]he must also draw the inference." ).

9        At deposition, plaintiff testified that during his UCC appearance, he told Scavetta of his

10  one physical fight resulting from his snoring.  Pl.'s Dep., at 53-54.  Scavetta admits that she

11  knew that plaintiff had sleep apnea and used a C-PAP at night.  SUF 16.  Scavetta also knew that

12  plaintiff was having difficulties with cellmates because of his snoring.  SUF 19.  However, there

13  was nothing unusual about conflicts based on snoring and the use of a C-PAP was not a

14  sufficient medical justification to have single-cell status.  SUF 18, 19; Def.'s Mot. for Summ. J.,

15  Ex. E.  Dr. Lamb's note, which stated no medical reason a temporary single cell, noted that an

16  "issue" needed to be resolved but contained no explanation of what issue had to be resolved.

17  SUF 9.  Moreover, it does plainly stated "temporary only."  Moreover, no medical staff had

18  informed Scavetta that plaintiff, as of November 4, 2004, was still in need of a single cell.  SUF

19  25.  No specific medical reason was stated in the note, and none was apparent to Scavetta, that a

20  serious medical need required a long term exception to the policy that inmates double-cell.

21  While one might characterize Scavetta's decision as, at worst, negligent, there is no evidence

22  here that she acted with deliberate indifference to a known serious medical need.

23       The cryptic Lamb note saying "single cell status" with the notation "temporary status

24  only" is not information that can support a finding that Scavetta acted in a manner sufficiently

25  harmful to plaintiff to evidence her deliberate indifference to a known serious medical need.

26  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  (Plaintiff must submit evidence of "acts or

1  omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.").

2  The note does not, itself, show that Scavetta knew of a serious medical issue and deliberately

3  ignored it. *Farmer*, 511 U.S. at 837 .

4      **D.  Qualified Immunity**

5      Because the Court concludes that Scavetta is entitled to summary judgment on the merits

6  as to each of plaintiff's claims, the Court does not reach defendant argument that she is entitled

7  to qualified immunity. *See Wilkie v. Robbins*, 127 S.Ct. 2588, 2608 (2007).

8  **V.  Conclusion**

9      For the reasons stated above, the court finds that Scavetta is entitled to judgment as a

10 matter of law.

11     Accordingly, it is hereby RECOMMENDED that:

12     1.  Defendant's June 17, 2008, motion for summary judgment be granted;

13     2.  Judgment be entered in her favor; and,

14     3.  The Clerk be directed to close the case.

15     These findings and recommendations are submitted to the United States District Judge

16 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after

17 being served with these findings and recommendations, any party may file written objections

18 with the court and serve a copy on all parties.  Such a document should be captioned "Objections

19 to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the

20 specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158

21 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

22 Dated:  February 10, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

23

24

25

26